UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ROBERT JONES,

    Plaintiff,

v.                                                                 Case No. 6:17-cv-2018-Orl-37TBS

LOWE'S HOME CENTERS, LLC; MTD
SOUTHWEST INC.; and TROY-BILT
LLC,

    Defendants.

_____

## ORDER

In this products liability case, Plaintiff Robert Jones sues Defendants for negligence and strict liability in the design and manufacture of a leaf blower whose impeller exploded during Plaintiff's operation. (*See* Docs. 2, 31.) To prove the design defect claims, Plaintiff retained Dr. Bryan Durig as his liability expert. (*See* Doc. 65-1, p. 1.) Defendants then filed a *Daubert* motion to exclude Dr. Durig's testimony and report as unreliable. (Doc. 64 ("***Daubert* Motion**").) Defendants also seek summary judgment on Plaintiff's design defect claims, premised on excluding Dr. Durig's testimony as unreliable. (Doc. 63, pp. 15–17 ("**MSJ**"); *see also* Doc. 64, pp. 1–2 (incorporating Defendants' MSJ arguments into *Daubert* Motion).) Defendants seek summary judgment on Plaintiff's manufacturing defect claims. (Doc. 63, p. 15.) On review, the Court finds that the *Daubert* Motion is due to be denied and the MSJ granted in part and denied in part.

## I. BACKGROUND

Mr. Jones works as a sexton at Maitland Presbyterian Church. (Doc. 62-1, p. 12:18–25.) He sets up for different church events, which involves cleaning leaves from the entryways before a service so congregants can enter. (*Id.* at 14:9–15, 17:23–25.) The church has a leaf blower for that purpose; in October 2016, it owned an electric blower/vacuum model TB197BV (**"Subject Blower"**), pictured below, that Mr. Jones used frequently. (*Id.* at 19:14–20.)



(Doc. 62-2, p. 18.) The TB197BV functions as both a blower and a vacuum, meaning it blows or vacuums air through the blower tube depending on the setting. (Doc. 65-1, p. 3, Doc. 63-6, p. 5.) It can produce an airstream for blower operation up to 245 miles per hour and 475 cubic feet per minute. (Doc. 65-1, p. 3.) Its motor can operate up to 16,000 rotations per minute, driving the impeller's rotation at the same speed. (*Id.*) And by nature, because leaf blowers essentially function to move debris around at high speeds, its operating manual instructs operators to wear protective eyewear during use. (Doc. 67-3, pp. 51:16–

23, 54:1–4.)

But debris is not always the issue, as Mr. Jones can attest. Mr. Jones will forever remember October 2, 2016. That morning, after a stormy night, Mr. Jones was using the Subject Blower to clear leaves before Sunday service started. (Doc. 62-1, p. 17:23–25.) He started by blowing the leaves off the front of the church, finishing in about three minutes. (*Id.* at 18:1–10.) He moved to the back of the church, plugged the Subject Blower in, and turned it on. (*Id.*) A couple minutes later, "it just exploded." (*Id.*) Pained, he immediately put his hand over his face and felt a "handful of blood"; his right eye was gushing and he started "screaming, asking somebody to help [him]." (*Id.* at 18:1–12.) Someone called 9-1-1, and Mr. Jones was taken to Florida South Hospital. (*Id.* at 18:1–10.)

At the hospital, a specialist came in to assess Mr. Jones' eye injury. (*Id.* at 31:6–12.) The specialist told Mr. Jones that without immediate surgery, Mr. Jones would lose his eye, so Mr. Jones went into surgery. (*Id.*) His eye had to be sewn back into its socket. (*Id.* at 37:23–38:2.) In total, Mr. Jones had three surgeries—the second was a laser repair of his retina and the third was to remove a cataract and implant a new lens. (*Id.* at 43:2–3, 9–11.) Despite the surgeries, his vision hasn't been restored. (*Id.* at 39:23–40:3.) What was once perfect is now a blur. (*Id.* at 11:9–16, 40:4–6.) His activities are now limited—he doesn't drive, go out at night, or go to the gym and lift weights. (*Id.* at 39:23–40:3, 40:11–19.) He has various work restrictions, too, and will not blow leaves anymore. (*Id.* at 41:10–18; Doc. 67-2, p. 15:18–25.)

Following the accident, Mr. Jones sued Defendants for negligence and strict liability based on manufacturing and design defects in the Subject Blower. (Doc. 2; *see also*

Doc. 56 (Plaintiff dismissed his failure to warn claims).) To support the design defect claim, Mr. Jones identified Dr. Bryan Durig as an expert in engineering. (Docs. 65-1; 63-4.) On evaluation, Dr. Durig submitted an expert report opining that the Subject Blower's inclusion of a plastic/polymer impeller was a design defect based on its propensity to fracture, and the Subject Blower should have used either a metal impeller or encased the plastic impeller with a metal lining or ring to guard against possible fracture. (Doc. 65-1, pp. 4–5.) Defendants seek to exclude Dr. Durig's testimony as unreliable (Doc. 64), and move for summary judgment on the same grounds (Doc. 63, pp. 15–17). Defendants also seek summary judgment on the manufacturing defect claims. (Doc. 63, p. 15.) Following full briefing (Docs. 65, 67, 70) and a hearing on the *Daubert* Motion (Doc. 75),[1] both matters are ripe.

## II. LEGAL STANDARDS

### A. *Daubert* Motion

In its gatekeeping role, a district court is tasked to ensure that juries only hear "expert" opinions that satisfy these requirements:

> **Qualifications**—a witness that is "qualified as an expert by knowledge, skill, experience, training, or education" may testify as to his opinions of scientific, technical, or other specialized knowledge (Fed. R. Evid. 702) ("**Qualification Requirement**");
>
> **Reliability**—the testimony is "based upon sufficient facts or data" (Fed. R. Evid. Rule 702(b)) and "is the product of reliable principles and methods" (Fed. R. Evid. Rule 703(c)), which the witness applied "reliably to

---

[1] At the hearing, the Court also heard argument on Plaintiff's motion to exclude Defendants' expert witness (Doc. 62). (*See* Doc. 75.) As explained there, the Court declined to rule on that motion if and until trial, as the relevance of such testimony depends on how Plaintiff presents his case. (*Id.*)

the facts of the case" (Fed. R. Evid. Rule 702(d)) ("**Reliability Requirement**"); and

**Helpfulness**—the testimony will help the jury to "understand the evidence or to determine a fact in issue" (Fed. R. Evid. Rule 702(a)) ("**Helpfulness Requirement**").

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th Cir. 1998); *see also Cooper v. Marten Transp., Ltd.*, 539 F. App'x 963, 965–67 (11th Cir. 2013). Importantly, the Court must abstain from credibility determinations and any assessment of the merits of an expert witness's opinion—which are matters exclusively reserved to juries—and must instead narrowly focus on whether the proponent of the expert witness has established the Qualification, Reliability, and Helpfulness Requirements. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–95 (1993); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 155 (2000).

To determine whether the Qualification Requirement is met, "courts generally look to evidence of the witness's education and experience" and determine whether such qualifications and expertise sufficiently "fit" with "the subject matter of the witness's proposed testimony." *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348, 1367 (M.D. Ga. 2010) (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)).

A determination on the Reliability Requirement involves several considerations that vary depending on the opinions and testimony, and include the following well-known *Daubert* factors:

(1) whether the expert's theory can be or has been tested;

(2) whether the theory has been subject to peer review and publication;

(3) the known or potential rate of error of the particular scientific technique; and

(4) whether the technique is generally accepted in the scientific community.

*Daubert*, 509 U.S. 579; *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004). The factors pertinent to an analysis of the Reliability Requirement—including the *Daubert* factors—"are only illustrative and may not all apply in every case." *United States v. Abreu*, 406 F.3d 1304, 1307 (11th Cir. 2005). Ultimately, the district court must identify the pertinent factors, and it is accorded "wide latitude in deciding how to determine reliability." *Id.*

Finally, the Helpfulness Requirement turns on:

> the common sense inquiry [of] whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*See* Fed. R. Evid. 702, Advisory Committee Notes (citation omitted).

The burden of establishing admissibility is borne by the proponent of the expert opinion. *See Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)); *see also Frazier*, 387 F.3d at 1260. The proponent need not prove that the opinion is scientifically correct, just that it is reliable and helpful. *See Lord v. Fairway Elec. Corp.*, 223 F. Supp. 2d 1270, 1279 (M.D. Fla. 2002) (citing Fed. R. Evid. 702, Advisory Committee Notes). If the proponent does so, then the court should open the gate by permitting the proponent to elicit testimony from

the expert witness about his or her reliable opinions and by allowing the jury to fulfill its role of determining the weight to accord such testimony. The Court's limited gatekeeping role "is not intended to supplant" presentation of contrary evidence to the jury or the practice of cross-examination in a courtroom. *See United States v. Ala. Power Co.*, 730 F.3d 1278, 1282–85 (11th Cir. 2013). Once the proponent satisfies the minimum threshold for admissibility, the parties' remaining reliability and relevance disputes must be decided by the jury—preferably based on the litigants': (1) presentation of contrary evidence, such as testimony from the litigant's own expert witness providing both contrary opinions and criticism of—among other things—the opposing expert's qualifications and the inaccuracy or unreliability of his or her opinions; and (2) use of cross-examination and appropriate legal argument. *See id.*; *see also Costa v. Wyeth, Inc.*, No. 8:04-cv-2599-T-27MAP, 2012 WL 1069189, at *2 (M.D. Fla. Mar. 29, 2012).

**B.     Summary Judgment**

Summary judgment is appropriate only if the movant shows there is no genuine dispute on any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On issues for which the movant would bear the burden of proof at trial, it must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on the essential elements. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citing *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys*, 941, F.2d 1428, 1438 (11th Cir. 1991)).

On issues for which the nonmovant would bear the burden of proof at trial, the movant has two options: (1) it may simply point out an absence of evidence to support the nonmoving party's case; or (2) it may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Four Parcels*, 941 F.2d at 1438 (citing *Celotex Corp.*, 477 U.S. at 325). "The burden then shifts to the nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the nonmovant, Battle, 468 F.3d at 759, so "when conflict arises between the facts evidenced by the parties, [the] court credit[s] the nonmoving party's version," *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). However, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. DISCUSSION

As Defendants' MSJ for the design defect claims rests on the admissibility of Dr. Durig's testimony (*see* Docs. 63, 64), the Court addresses this issue first. The Court then turns to Plaintiff's manufacturing defect claims.

### A. Design Defect Claims

To support the design defect theory, Plaintiff contends that the Subject Blower contained a design defect by including a plastic/polymer impeller without guarding against the foreseeable risk of impeller failure. (Doc. 67, p. 4.) Plaintiff proffers the testimony of Dr. Durig, a registered professional engineer who specializes in failure analysis. (*Id.* at 9.)

In evaluating the Subject Blower, Dr. Durig employed the safety analysis known as the Failure Modes and Effects Analysis ("**FMEA**"), which is "step-by-step approach for identifying all possible failures in a design, a manufacturing or assembly process, or a product or service." (Doc. 65-1, p. 4.) He also considered this data and information:

> I have visually observed the subject Troy-Bilt TB197BV handheld blower/vacuum. I have also observed an exemplar Troy-Bilt TB197BV and TB180B. I have reviewed the Complaint and initial Answers. I have reviewed depositions of Mary Anne Losasso and Robert Jones. I have reviewed the Affidavit from Brian Eidson. I have reviewed Discovery material from Lowe's, MTD and Troy-Bilt. I have reviewed an industry standard for handheld blower/vacuums (IEC 60335-2-100. I have reviewed safety engineering books/references discussing the safety hierarchy. I have reviewed the Troy-Bilt recall notice for the TB180B blower and the 2007 recall for a similar Toro blower. I have reviewed similar blowers and blower/vacuums sold by other companies including Toro. It is understood that discovery is still going on and will continue into the near future. I expect to review any additional depositions taken during the Discovery process. Any of the above items may be used as an exhibit at trial.
>
> In addition, I am also relying on my knowledge, education, training and experience in investigating numerous accidents over the last twenty-six years.

(*Id.* at 2.)

Following the FMEA, Dr. Durig identified as possible failure in the TB197BV "[t]he failure or fracture of an impeller rotating at 16,000 rpm's[, which] would create a hazardous condition to the operator of the blower/vacuum or anyone standing nearby." (*Id.*) According to Dr. Durig, this was a known industry failure when such plastic impellers were used in leafblowers:

> Toro had a 2007 recall of blowers for "Hazard: The blower's impeller, which is a rotating component on the blower, can break, resulting in pieces of plastic flying out of the blower. This poses a risk of serious injury to the user or a bystander." Plastic impeller failures can eject fracture parts which could strike the operator or bystanders. The Toro recall states Lowe's sold some of the subject Toro blowers as well. Although the Toro blower and the Troy-Bilt TB180B blower were manufactured to only operate in a blower mode, the hazard when the impeller fails is the same as a blower/vacuum. Since the blower/vacuum can operate as a yard vacuum with the impeller rotating at very high speeds, it is more likely the plastic/polymer impeller might unexpectedly get a hard object (acorn or pebble) sucked into the vacuum tube and strike the impeller than just the simple blower. Therefore, it is forseeable that the rotating plastic/polymer impeller of the Troy-Bilt TB197BV may fracture during expected use of the blower/vacuum unit.

(*Id.* at 5.) Because the Subject Blower used such an impeller, Dr. Durig opined that "the Troy-Bilt TB197BV is considered defective and unreasonably dangerous as the failure of the plastic/polymer impeller rotating at a high speed (16,000 rpm's) can be ejected out of the blower/vacuum's housing and strike the operator or bystander." (*Id.* at 6.)

After identifying this hazard, Dr. Durig followed the "Safety Hierarchy, used when designing machinery and/or other products." (*Id.* at 4.) The Safety Hierarchy "specifies one should eliminate the hazard as its first option when dealing with designs and known/foreseeable hazards." (*Id.*) This could be done, according to Dr. Durig, by using a "metal impeller"—this would "eliminate the plastic/polymer impeller fracturing into many smaller pieces/projectiles," and had been done a competitor, Toro. (*Id.*) But replacing the TB197BV's impeller with a metal impeller was not the only way to protect against this hazard. Under the Safety Hierarchy, the "second option . . . is to guard against the product hazard." (*Id.*) Dr. Durig found "no guards in the [Subject Blower] to retain the fractured parts of a rotating impeller that fails and keep them within the body of the blower/vacuum." (*Id.* at 4–5.) Rather, the Subject Blower had a "thin plastic housing." (*Id.* at 5.) So Dr. Durig found that:

> A metal lining or ring . . . would provide a layer of protection for the operator's entire body, including his neck, face and eyes. The metal lining/ring would be attached to the inside of the housing such that if the plastic/polymer impeller failed, the fractured parts would come into contact with the metal lining/ring rather than fracturing the plastic housing of the blower/vacuum.

(*Id.*) Beyond these two steps, "warnings are the third option in the Safety Hierarchy to alert the user of the product hazard," and "instructions are the fourth option." (*Id.*)

-11-

Against this backdrop, Defendants challenge Dr. Durig's opinion as unreliable (and therefore inadmissible) because Dr. Durig performed no testing on the Subject Blower or on either proposed alternative design. (Doc. 64, pp. 3–4; Doc. 63, pp. 15–17.) Plaintiff retorts that Dr. Durig employed a sufficiently reliable methodology to form his ultimate opinions—the FMEA and Safety Hierarchy—and the lack of testing does not render his testimony inadmissible. (Doc. 65, pp. 4–13.) On review, the Court agrees with Plaintiff that Dr. Durig's testimony meets the requirements of *Daubert* and is therefore admissible. As Defendants' main concern is the Reliability Requirement, the Court focuses its analysis there.

Boiled down, Dr. Durig's opinion is that the Subject Blower is unreasonably dangerous based on a design defect; the design defect being that the plastic/polymer impeller it uses can fracture and then be ejected out of the housing. (Doc. 65-1, pp. 4–6.) Dr. Durig then identifies two ways to ameliorate this defect: (1) using a metal impeller; or (2) make the impeller's housing more robust by attaching a metal lining or ring to contain any small plastic pieces should an impeller fail. (*Id.*) He reached his opinion by employing FMEA analysis and following the Safety Hierarchy and by considering additional data and information. (*Id.*)

As the FMEA is well-established within the field of engineering—which Defendants do not contest—the Court finds that Dr. Durig's methodology is sufficiently reliable to render his testimony admissible. *See, e.g.*, *Covas v. Coleman Co., Inc.*, No. 00-8541-CIV, 2005 WL 6166740, at *5–6 (S.D. Fla. May 22, 2008) (finding expert testimony that applied relevant safety standards reliable despite lack of testing and physical

examination of product). In so finding, the Court rejects Defendants' argument that Dr. Durig's "alternative design" opinions are unreliable. (Doc. 64, p. 4; Doc. 63 pp. 15–17.) The Court finds that to classify Dr. Durig's opinions as "alternative designs" is a misnomer, since his opinion centers on the *hazard* created by a plastic/polymer impeller. (*See* Doc. 65-1, pp. 4–6; Doc. 63-4, p. 54:8–21.) This is the *sine qua non* of Dr. Durig's testimony—this product is defective because the fracture is foreseeable. (Doc. 63-4, p. 54:8–21.) After establishing this, Dr. Durig then opines how, under the Safety Hierarchy, this hazard could be eliminated or guarded against. (Doc. 65-1, pp. 4–6; Doc. 63-4, pp. 55:24–57:5.) In context of his opinion, however, these options he identifies are part of the Safety Hierarchy methodology, not specifically alternative designs. (*See* Doc. 63-4, p. 54:8–21.) So, that Dr. Durig did not test either option does not render his testimony inadmissible.

Yet even if this were an alternative design opinion, "Florida does not require a plaintiff to prove the availability of an alternative design in design defect cases." *Diaz-Granados v. Wright Med. Tech., Inc.*, No. 6:14-cv-1953-Orl-28TBS, 2016 WL 1337264, at * 3 n.8 (M.D. Fla. Apr. 1, 2016) (citing *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 510 (Fla. 2015)). Where, as here with competitors using metal impellers (Doc. 65-1, p. 4), "the proposed alternative design has been produced and put to practical use in the industry, the expert does need to personally test it to satisfy *Daubert*." *Moncrieffe v. Clark Equip. Co.*, No. 06-22644-CIV-GOLD/MCALILEY, at *8 (S.D. Fla. July 23, 2008). With this, Dr. Durig's opinion and testimony is plainly admissible under *Daubert*, and Defendants' *Daubert* Motion is due to be denied. All of Defendants' identified issues with Dr. Durig's

testimony are proper fodder for cross-examination, not exclusion. And because Defendants' MSJ for the design defect claims depends on the inadmissibility of Dr. Durig's opinion,[2] the Court denies the MSJ on those grounds.

B. **Manufacturing Defect Claims**

Next, Defendants seek summary judgment on Plaintiff's manufacturing defect claims because they are unsupported by expert testimony as required. (Doc. 63, p. 15.) In response, Plaintiff maintains that given the nature of his claims, he is entitled to the *Cassisi* inference and need not provide expert testimony. (Doc. 67, pp. 9–12.) Defendants counter that the *Cassisi* inference is wholly inapplicable here, as evidenced by the evolution of its application and the record evidence. (Doc. 70, pp. 3–8.)

*Cassisi v. Maytag Co.*, 396 So. 2d 1140 (Fla. 1st DCA 1981) was a landmark case on a plaintiff's burden for manufacturing defect claims when there is "proof of the [product's] malfunction during normal operation." *Id.* at 1150. The court held that "when a product malfunctions during normal operation, a legal inference . . . arises, and the injured plaintiff thereby establishes a prima facie case for jury consideration." *Id.* at 1147 (citing *Greco v. Bucciconi Eng'g Co.*, 283 F. Supp. 978 (W.D. Pa. 1967), *aff'd* 407 F.2d 87 (3d Cir. 1969)). There, the plaintiff left her home with her dryer running and came back to

---

[2] The MSJ also argues that summary judgment is appropriate for the design defect claims based on Plaintiff's failure to show that the design defect cause his eye injury because "the experts agree that if Mr. Jones had worn the recommended eye protection, then he would not have injured his eye at all." (Doc. 63, p. 17.) Putting aside that Dr. Durig opined that eye protection would not eliminate the hazard posed by the Subject Blower (Doc. 63-4, pp. 67:12–68:7), here, as in most cases, causation is a jury issue. *See McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992).

-14-

find her house "ravaged by fire." *Id.* at 1143. Her expert "was unable to pinpoint a specific defect within the dryer," but offered the opinion "that the fire had begun inside the dryer," potentially based on an "electrical short." *Id.* After extensive consideration, the court determined that based on the nature of the accident, the type of product, the level of control exercised by the user while operating the product, its history of use and repair, and the expert's opinion, the plaintiff had sufficiently provided "evidence of the product's defective condition at both the time of the injury and at the time of sale." *Id.* at 1153. To invoke the *Cassisi* inference, a court must consider the application of these factors to the product in question. *See id.* at 1152–53.

Here, the Court finds *Cassisi* inapplicable to the Subject Blower. First, as Defendants point out (Doc. 70, p. 3), the Subject Blower still exists and was reviewed by Plaintiff's expert who specifically offered no opinion on possible manufacturing defects. (Doc. 63-4, pp. 31:9–32:9 (Dr. Durig's deposition)); *see also Cannioto v. Louisville Ladder, Inc.*, 449 F. App'x 797, 798 (11th Cir. 2011) (affirming district court's decision finding *Cassisi* inapplicable based in part on district court's finding that "the [product] in question still existed and had been inspected by the plaintiffs' expert").[3]

The *Cassisi* factors do not support extending Plaintiff a *Cassisi* inference here, even when the facts are viewed in Plaintiff's most favorable light. Little is known about the Subject Blower's product history, including the date of purchase, whether it was used

---

[3] While unpublished opinions are not binding precedent, they may be considered as persuasive authority. *See* 11th Cir. R. 36-2; *see also United States v. Almedina*, 686 F.3d 1312, 1316 n.1 (11th Cir. 2012).

exclusively by church employees, and whether it was ever dropped or damaged. (Doc. 67-2, pp. 6:3–7:16, 12:10–12, 13:7–14:2.) The TB197BV had a two-year manufacturer warranty, but the Subject Blower had been used for at least three years. (*Id.* at 6:18–7:16; Doc. 70-2, p. 68:18–24.) Under the TB197BV's operation manual, "normal" use of the blower/vacuum is limited to household use, not in other settings like the church here. (Doc. 70-2, p. 64:1–9.) These "condition" factors therefore weigh against applying *Cassisi* here.

What's more, "unlike a dryer, which is operated simply by pushing a few buttons," operating the Subject Blower "requires substantial human agency of the sort not contemplated by the *Cassisi* Court." *See Garner v. Ford Motor Co.*, 166 F. Supp. 3d 1261, 1268 (M.D. Fla. 2015). For the Court, this factor is particularly controlling and militates against Plaintiff, as the TB197BV's primary purpose is to hurl debris around at high rates of speeds. (Doc. 65-1, p. 3 (Dr. Durig describing the TB197BV); Doc. 70-2, pp. 63:24–64:15 (TB197BV's function is to blow debris).) How the Subject Blower is operated, what type of debris is moved, the outside conditions, and other details surrounding its use depend wholly on the operator, not the product. In *Cassisi*'s words, "[t]he user's relationship" with the TB197BV "normally involve[s] hazardous conduct or active participation." 396 So. 2d at 1152. It is not "somewhat passive and custodial in nature," like that of "self-operating" products—"television sets, electric stoves, clothes washers or dryers." *Id.* Thus, *Cassisi*'s legal inference simply cannot be extended to the Subject Blower. *E.g.*, *Garner*, 166 F. Supp. 3d at 1267–68; *Cannioto*, 449 F. App'x at 798–99.

Without *Cassisi*, Plaintiff has not demonstrated a genuine issue of material fact to survive summary judgment for his manufacturing defect claims. (*See* Doc. 67, pp. 8–12 (Plaintiff relying on *Cassisi* for these claims).) Hence, the Court grants Defendants' MSJ for these claims. (Doc. 63, p. 15.) This action will proceed on Plaintiff's design defect claims found in Counts I through IV of the Complaint. (Doc. 2, ¶¶ 29–60.)

### IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion in Limine to Preclude the Testimony of Dr. Durig with Incorporated Memorandum of Law (Doc. 64) is **DENIED**.

2. Defendants' Motion for Final Summary Judgment with Incorporated Memorandum of Law (Doc. 63) is **GRANTED IN PART AND DENIED IN PART**:

    a. The Court **GRANTS** summary judgment in Defendants' favor on Plaintiff's manufacturing defect claims found in Counts I through IV of the Complaint (Doc. 2, ¶¶ 29–60).

    b. In all other respects, the Motion is **DENIED**.

3. The Clerk is **DIRECTED** to enter judgment in Defendants' favor and against Plaintiff on the manufacturing defect claims contained in Counts I through IV of the Complaint (Doc. 2, ¶¶ 29–60).

4. This matter will proceed to trial on Plaintiff's remaining claims.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on March 19, 2019.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record